**UNITED STATES of America, Appellee,**

v.

**David Allen RESNICK, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Mark Dennis JUNO, Appellant.**

**Nos. 83–2392, 83–2405.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 11, 1984.

Decided Oct. 11, 1984.

Rehearing Denied in No. 83–2392
Nov. 8, 1984.

Thomas J. Flynn, Andrew J. Mitchell, Minneapolis, Minn., for Resnick.

Paul Engh, Minneapolis, Minn., for Juno.

Thomas B. Heffelfinger, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before McMILLIAN, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

* The HONORABLE THOMAS E. FAIRCHILD, United States Senior Circuit Judge for the Seventh Circuit, sitting by designation.

JOHN R. GIBSON, Circuit Judge.

David Allen Resnick was convicted by a jury on two counts, and Mark Dennis Juno on three counts, of unlawful distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2(a) (1982); both were also convicted on one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846 (1982). For reversal, both Juno and Resnick argue that the district court[1] erred in denying their motions for acquittal at the close of the government's case-in-chief, because there was insufficient evidence to support their convictions. Juno argues that the government failed to prove that he was predisposed to distribute cocaine, an issue in his entrapment defense. Resnick also argues that certain hearsay statements by Juno, which implicated Resnick, should not have been admitted under the coconspirator exception because the government failed to adduce independent evidence of a conspiracy. Juno also contends that his trial counsel was inadequate, that the police misled him into cooperating, and that his sentence was too harsh. We affirm.

On March 2, 1983, Hennepin County Sheriff's Deputy Corey Thompson, while working undercover, met Mark Juno at the apartment of a known drug dealer with whom Thompson had been dealing. Juno was delivering one pound of marijuana and one gram of cocaine for Thompson to purchase. Juno and Thompson discussed a possible purchase of one-quarter ounce of cocaine from Juno by Thompson. They agreed to contact each other the following week.

On March 24, 1983, Thompson, still working undercover, met Juno at the Basin Bar, where Juno worked as a bartender. Juno told Thompson that he had a source who would provide good quality cocaine but who would not deal in quantities of less than one-half ounce. Juno offered to find another party to split the one-half ounce with Thompson. He also told Thompson that he had another source who had less expensive cocaine of a lower quality. After a short wait Juno returned to Thompson and told him that he could not find anyone to split the one-half ounce, but that if Thompson could find money for the full one-half ounce, a sale could be arranged. Thompson told him he did not have enough money and that he would have to arrange to meet at a later date.

On March 29, 1983, Thompson again met Juno at the Basin Bar and discussed purchasing one-quarter ounce of cocaine. Juno told Thompson that his source for good quality cocaine would only sell in one-half ounce quantities and tried unsuccessfully to find someone to split the one-half ounce with Thompson. Thompson then bought one-quarter ounce of lower quality cocaine, which Juno obtained from the other source. When he delivered the cocaine, Juno again told Thompson that he could get better cocaine from his other source.

On April 19, 1983, Juno telephoned Thompson at an undercover telephone number Thompson had given him. He arranged for Thompson to purchase one-half ounce of the better quality cocaine. He told Thompson that the source would bring the cocaine to him, but that Juno would have to be given the money first and would have to go a short distance to meet the source. This conversation was tape recorded and later played for the jury at trial.

That evening Thompson met Juno at the Basin Bar to purchase the one-half ounce of cocaine. They agreed that the purchase price would be $1,400 and went to Thompson's car where Thompson gave that sum to Juno in cash. Juno told Thompson he would be back in twenty or thirty minutes with the cocaine.

While Thompson returned to the bar, surveillance officers saw Juno leave Thompson's car, go directly to his own car, and drive away from the bar. They followed him approximately one mile to the parking lot of a Tom Thumb store, where

1. The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

Juno parked his car and remained inside. Approximately twenty minutes later a 1973 Buick, which a license plate check revealed to be registered to a David A. Resnick, pulled into the parking lot and parked. Its occupant walked over to Juno's car and got in. The two remained in Juno's car approximately five minutes; then the driver of the Buick returned to his car and drove away. Surveillance officers followed the Buick and were able to identify Resnick as the driver and lone occupant. Juno was followed by surveillance officers directly back to the Basin Bar.

Juno and Thompson then went to Juno's car, where Juno gave Thompson approximately one-half ounce of what was later determined to be approximately 77%-pure cocaine. Juno told Thompson that he had been dealing with drugs for at least nine years and that he had been dealing with that source for five years. Juno also said that the one-half ounce was very good quality and that he had used some while he was obtaining the one-half ounce from his source that evening. Juno and Thompson discussed the manner in which Juno sold cocaine; Juno told Thompson that he would have no problem selling the one-half ounce he had just purchased. They agreed to contact each other later.

Once on April 28 and three times on May 2, 1983, Juno telephoned Thompson at the undercover number. He asked Thompson if he wanted any cocaine, stating that his April 19 source had some available and that the source lived south of Brooklyn Park. These conversations were tape recorded and played for the jury.

During the afternoon of May 3, 1983, Juno telephoned Thompson five times. During these conversations, which were recorded and played for the jury at trial, Juno and Thompson arranged for Thompson to purchase two ounces of the better quality cocaine for $5,400. The transaction was arranged for that evening at approximately 9:00 p.m. because the source had a softball game that evening. Juno also stated that his source would call him at the bar that evening when he was ready and that

when he got the call, he would have to "run quick." Late that afternoon one of the surveillance officers observed Resnick, wearing a gray sweat suit and a visor cap, leave his St. Louis Park apartment in a 1973 Plymouth with a dark body and a lighter vinyl top.

At approximately 9:05 p.m. Thompson met Juno at the Basin Bar. Juno told him that he would have to have the $5,400 "up front" and that it would take approximately ten to twenty minutes to perform the transaction, which would occur within three blocks of the bar. They went to Thompson's car, where he gave Juno $5,400 of officially recorded funds. Both men returned to the Basin Bar. A few minutes later Thompson entered the bar's men's room and saw Juno, who appeared surprised to see him there. When Thompson stated that he was nervous, Juno responded, "Don't worry. I have done this numerous times." He told Thompson that the transaction would be completed within ten minutes. They left the men's room together and parted company. At 9:23 p.m. Juno met Thompson near the bar entrance and gave him approximately two ounces of cocaine, later determined to have an average purity of 62.9%. Juno told him that his source was no longer at the bar and had gone directly home.

At approximately this same time a surveillance officer saw a Plymouth automobile with a white or cream-colored top and a maroon or bronze-colored body drive out of the Basin Bar parking lot. The officer identified the car in which Resnick was later arrested as being identical in color and appearance to the car he had seen leaving the Basin Bar.

Minutes after he gave Thompson the two ounces of cocaine, Juno was arrested. Approximately eleven grams of 90%-pure cocaine were recovered from his hand at the time of his arrest. Juno subsequently gave a statement in which he identified David Resnick as his source for the cocaine on both April 19 and May 3. This post-arrest statement was not offered by the government at trial as part of its case-in-chief but

was referred to in its cross-examination of Juno.

At approximately 9:45 p.m. a surveillance officer observed Resnick returning to his apartment in St. Louis Park in the same Plymouth in which he had earlier been seen leaving. Resnick's apartment is approximately twenty to twenty-five minutes driving time from the area of the Basin Bar. Resnick looked directly at the surveillance officer and, after parking his car, remained in his car for several minutes and appeared to be bending over the front seat area. Resnick was arrested as he got out of the car. The car was seized by the police and a search warrant obtained. Later the same night, the police searched the car and found a softball glove in the back seat and, under the dashboard, the $5,400 of officially recorded funds that Thompson had given to Juno to buy the two ounces of cocaine. The stack of bills was wrapped in the same manner as it had been when Thompson had given it to Juno. After being advised of his rights, Resnick commented to the police: "I suppose they arrested the bartender too." At no time had the police mentioned Juno or his occupation to Resnick.

Juno was charged on three counts of distributing cocaine, based on the March 29, April 19, and May 3 transactions.[2] Resnick was charged on two counts for the April 19 and May 3 sales. Both were charged on one count of conspiring to distribute cocaine. The one-half ounce of cocaine purchased on April 19 had an approximate "street value" of $5,000; the two ounces purchased on May 3 had a "street value" of approximately $15,000. At the conclusion of the government's case-in-chief, both Juno and Resnick moved for judgments of acquittal, claiming that there was insufficient evidence. The motions were denied.

## I.

■ Before we may consider whether there was sufficient evidence to support appellants' convictions, we must address Resnick's contention that our review of the evidence may not encompass Juno's hearsay statements to the undercover police officer. Resnick specifically argues that these statements linking Resnick to the alleged conspiracy were erroneously admitted to prove guilt of the conspiracy charge. This issue was not properly preserved for appeal because Resnick did not object to the admission of these statements at trial. *See United States v. Vitale,* 728 F.2d 1090, 1092 (8th Cir.1984). We may reverse only if the district court's admission of such evidence constituted plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Poston,* 727 F.2d 734, 740 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 2179, 80 L.Ed.2d 461 (1984). Under the plain error rule, Resnick must show that the district court erred and that the error had a substantial adverse effect upon his rights, *Poston,* 727 F.2d at 740; *United States v. Grady,* 665 F.2d 831, 834 (8th Cir.1981), resulting in a miscarriage of justice. *United States v. Anderson,* 654 F.2d .1264, 1268 (8th Cir.1981), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981), 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982).

■ The government argues that Juno's statements were properly admitted into evidence under the coconspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E). In *United States v. Panas,* 738 F.2d 278 (8th Cir.1984), we reiterated the standards set forth in *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978), governing the admissibility of hearsay statements against a coconspirator:

An out-of-court declaration of a coconspirator is admissible against a defendant if (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the declaration was made during the course and in furtherance of the conspiracy. Where the defendant asserts that no conspiracy existed at the time the challenged statements were made, the government must

---

**2.** Juno was also charged with possession with intent to distribute the cocaine found in his hand at the time of arrest. He was acquitted of this charge.

show by a "preponderance of independent evidence" that a conspiracy existed. This standard provides that a coconspirator's statements are admissible "if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course ... of an illegal association to which the declarant and the defendant were parties." While the evidence must be independent, *i.e.*, exclusive of the challenged statements, it may be circumstantial[.] The district court's determination will not be reversed unless clearly erroneous.

*Panas*, 738 F.2d at 282 (quoting *United States v. Singer*, 732 F.2d 631, 635–36 (8th Cir.1984)).

Resnick argues specifically that there was inadequate evidence independent of the statements to demonstrate that he and Juno were members of a conspiracy at the time the statements were made. Proof of the existence of a conspiracy requires proof of an agreement between the coconspirators to accomplish the objective of the illicit agreement; it is unnecessary, however, to show a formal or express agreement. *United States v. Taylor*, 599 F.2d 832 (8th Cir.1979). We must view the evidence in the light most favorable to the government. *United States v. Young*, 634 F.2d 1136, 1136 (8th Cir.1980); *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ On April 19, in a car parked in a nearby parking lot, Juno met Resnick alone immediately after receiving Deputy Thompson's money, without contact with any other individuals, then returned directly to Thompson with the one-half ounce of cocaine. Resnick was positively identified by surveillance officers as the person Juno met on April 19. The automobile license check confirmed that the car Resnick was driving was his own. On May 3, Resnick was observed leaving his home in a car that matched the description of the car later spotted leaving the Basin Bar very shortly after Juno delivered two ounces of cocaine to Thompson. Resnick arrived at home driving the same car about twenty minutes later, the approximate driving time from the Basin Bar. Resnick bent low in the car before getting out. After Resnick's arrest, the $5,400 in recorded funds that Thompson gave Juno for the cocaine purchase were found under the dashboard. Finally, without being told of Juno or Juno's occupation, Resnick commented to police, "I suppose they arrested the bartender too."

This case is distinguishable from *United States v. Frol*, 518 F.2d 1134 (8th Cir.1975), which involved only one drug transaction and where the government money was never recovered. Rather, the circumstances here are consistent with those in *United States v. Williams*, 604 F.2d 1102 (8th Cir. 1979), and *United States v. Macklin*, 573 F.2d 1046 (8th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978), where we held that repeated meetings between the defendant and the person actually making the sales to the police were sufficient evidence of a conspiracy for purposes of admitting coconspirators' hearsay statements. The evidence linked Resnick to both the April 19 and May 3 transactions. The present case is also distinguishable from *United States v. Holder*, 560 F.2d 953 (8th Cir.1977), where there was no evidence that the defendant ever met with the sellers and no transaction involving him was ever observed. Here Resnick was observed meeting alone with Juno. Resnick was not merely present or associated with Juno. *See United States v. Harshaw*, 705 F.2d 317, 321 (8th Cir.1983).

Moreover, the fact that some of the independent evidence postdated Juno's statements is of no consequence "so long as its natural tendency, when introduced, was to show the concert of action to have been existing at the time of the statement." *Panas*, 738 F.2d at 283 (quoting *United States v. Everidge*, 488 F.2d 1, 3 (1st Cir. 1973)). The evidence revealed that Juno made the statements while arranging future sales and while completing present sales. We conclude that the "natural tendency" of the independent evidence linking Resnick to the sales of April 19 and May 3

makes it more likely than not that an ongoing conspiracy existed when Juno's statements were made. It is clear that Juno's statements were made during the course of and in furtherance of a conspiracy under Rule 801(d)(2)(E).

Because there was no objection to the admission of Juno's statements, the procedural steps established in *Bell,* 573 F.2d at 1044–45, were not required. *See also Macklin,* 573 F.2d at 1049. The only issue is whether there was plain error in admitting the evidence. Because compelling independent evidence demonstrates that it was more likely than not that Resnick was a participant in an ongoing conspiracy with Juno, we conclude that there was no plain error in admitting this evidence. Hence these statements may be considered in our review of the sufficiency of the evidence to support appellants' convictions.

## II.

In reviewing the sufficiency of the evidence supporting appellants' convictions, we view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences that may logically be drawn therefrom. *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469; *Taylor,* 599 F.2d at 838. In *Taylor* we further explained that

> the evidence need not "exclude every reasonable hypothesis except that of guilt but simply [must] be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." * * * [C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence. * * * Finally, the uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it is not otherwise incredible or unsubstantial on its face.

*Id.* (citations omitted).

Resnick and Juno contend that the district court should have granted their motions for judgment of acquittal at the close of the government's case-in-chief. They further contend that this Court may review only that evidence presented in the government's case-in-chief and that the "waiver doctrine," which would permit review of the rest of the evidence as well, should not apply. We need not decide whether application of the "waiver doctrine" is appropriate in this case, however, because our review of the evidence presented solely in the government's case-in-chief convinces us that there was sufficient proof to sustain appellants' convictions.

### A.

■ Resnick argues that there was insufficient evidence to convict him of the two counts of unlawfully distributing cocaine on April 19 and May 3. On neither date, he argues, were drugs seen in his possession. Nor was any actual transaction witnessed. He points out that Juno was never searched before either alleged transaction and that no government money was ever found in Resnick's apartment or in his possession.

Resnick likens the April 19 evidence to that held insufficient in *Holder, supra.* In *Holder,* a codefendant had referred to a source by what was Holder's nickname, but had never specifically identified Holder as that source. The codefendant was seen entering and departing Holder's apartment with the drugs.

We do not view *Holder* as controlling, however, because the evidence here, considered as a whole, is significantly stronger. On April 19, Resnick was positively identified as the person meeting with Juno in the parked car. The location of the meeting, its distance from Resnick's apartment and the Basin Bar, its duration, Juno's statements before and after the meeting regarding his source, and Juno's subsequent return to the Basin Bar with the cocaine constitute significant circumstantial proof of Resnick's involvement. It is not necessary that the evidence preclude other reasonable possibilities, such as Resnick's suggestion that Juno was merely telling a "cover story" to avoid being "ripped off." Juno's credibility was a matter for the jury to weigh.

Resnick similarly contends that the May 3 evidence was insufficient. Resnick points out that no one saw him in or around the Basin Bar, and that no transaction was ever observed. Yet, a car matching the one Resnick was driving was seen at the Basin Bar at the critical time; and Resnick arrived at home in this car after a lapse of time corresponding to that needed to drive there from the bar. Moreover, the discovery of the government money in the dashboard shortly afterward provided additional circumstantial evidence. Finally, Juno's statements to the undercover agent forged yet another vital link between Resnick and the transaction.

We conclude that the evidence was sufficient to establish that Resnick was associated with the distribution of cocaine, took steps to ensure successful sales, brought the cocaine at least part way to the transaction sites, received the purchase money, and talked to Juno by telephone to make arrangements for both of the sales. It was not essential for the government to show Resnick in actual possession of the cocaine. *United States v. Anziano*, 606 F.2d 242, 245 (8th Cir.1979). In light of the compelling circumstantial evidence as to both transactions, we conclude that a reasonable jury could have found Resnick guilty on both counts.

**B.**

■ At trial Juno's defense on the three counts of illegal distribution of cocaine was entrapment. The principal focus of inquiry where entrapment is alleged is the intent or predisposition of the defendant to commit the crime. *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973); *United States v. Lard*, 734 F.2d 1290, 1293 (3th Cir.1984). Juno challenges his convictions on the ground that the government failed to prove beyond a reasonable doubt that he was predisposed to commit those crimes.

■ To prevail in his contention that his motion for judgment of acquittal should have been granted, Juno must show entrapment as a matter of law. *United States v. Shaw*, 570 F.2d 770, 772 (8th Cir.1978).

To make that showing the evidence must clearly have indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent. *Id.* (citations omitted).

■ Juno presented evidence that he could not turn away from cocaine and that he was uncontrollably afflicted. Thus, Deputy Thompson's initiation of the cocaine sales was impossible for him to resist. Juno argued at trial that he dealt with Thompson only so that he could have a small share of the cocaine for personal consumption. He contends that he was a willing participant only to the extent he could not control his habit.

We must review the evidence on this issue in the light most favorable to the government. *United States v. French*, 683 F.2d 1189, 1192 (8th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982). The record shows that Thompson did approach Juno initially, but only after Juno had delivered some drugs to him at another dealer's apartment. While Juno exhibited some initial uncertainty, he presented Thompson with alternative sources of cocaine and offered to find others to split the amount with him. Juno telephoned Thompson several times to apprise him of available cocaine and to arrange the transactions. Juno assured Thompson that he had been dealing in drugs for several years. We believe that from this evidence the jury could find beyond a reasonable doubt that Juno was predisposed to sell cocaine.

**C.**

■ Juno and Resnick challenge the sufficiency of the evidence as to their conspiracy convictions, arguing that at best only a buyer-seller relationship, not a concerted

effort, was established. Again, we must review the evidence in the light most favorable to the government.

As we concluded above, sufficient evidence established that Resnick was Juno's source for the April 19 and May 3 transactions. In addition, Juno told the undercover officer that he had been dealing with the April 19 source for approximately five years. Numerous telephone calls between Juno and Thompson, and Resnick and Juno, in which the logistics and terms were agreed upon, preceded these transactions. When Resnick was arrested he commented without provocation, "I suppose they arrested the bartender too." This evidence, viewed as a whole with the evidence set forth above in support of the other convictions, adequately supports the inference that they were not only seller and buyer, but were also agreeing to use their arrangement to distribute to others, like Thompson. This case is similar to *Taylor, supra,* in which it was established that one coconspirator supplied the weapons and set the prices while the other performed the actual sales. 599 F.2d at 839.

### III.

█ Juno also argues in his pro se brief (1) that the police obtained a confession from him in violation of the fifth and sixth amendments, (2) that he was denied his sixth amendment right of effective assistance of counsel, (3) that his sentence was inappropriately harsh, and (4) that the government did not prove him to be a "dealer."

Juno contends that after being read his *Miranda* rights upon his arrest, he asked for an attorney but the police persisted in questioning him, making threats and guarantees. The government argues that Juno waived his fifth and sixth amendment rights by proceeding to answer questions and that Juno did not unequivocally ask for an attorney but rather asked whether he should have one. The government also points out that any constitutional violation here is harmless in any event, since Juno's post-arrest statements were not offered in the government's case-in-chief. Having concluded that the evidence presented in the government's case-in-chief was sufficient to support Juno's convictions, we agree that if any constitutional violation occurred, it was harmless beyond a reasonable doubt. *See United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

█ Juno argues that he was denied effective assistance of counsel at trial. Specifically, he argues that his attorney disclosed documents to the prosecution that were used in cross-examining Juno. The documents contained Juno's statements that he had been a drug pusher for six years and had a $50- to $60-a-day habit. Juno also contends that his attorney erred in deciding not to call upon an expert witness to testify concerning Juno's cocaine addiction and its effects. Finally, he contends that the attorney failed to mention the threats and promises made by the police during post-arrest questioning.

Juno must demonstrate that his attorney failed to provide reasonably effective assistance, thereby prejudicing his defense. *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. Peeler,* 738 F.2d 246, 250 (8th Cir.1984). In *United States v. Sheehy,* 670 F.2d 798 (8th Cir.1982), we set forth the applicable standard of review:

> The standard of review for effective assistance of counsel is whether the attorney " 'exercised the customary skill and diligence that a reasonably competent attorney would perform under such circumstances.' " * * * The court must determine first whether the attorney breached a duty to his client and secondly, whether prejudice followed from the breach.

*Id.* at 799 (citations omitted). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 104 S.Ct. at 2066. To establish that counsel's conduct was prejudicial, the defendant must show that there is a "reasonable possibility that, but for counsel's unprofession-

al errors, the result of the proceedings would have been different." *Id.* at 2068.

Applying this stringent standard, we must conclude that Juno was not denied effective assistance of counsel. His attorney's decisions concerning Juno's cross-examination, what witnesses to call, and what line of argument to pursue were all conscious, tactical decisions. Furthermore, there is little indication that the results would have been different had different decisions been made. Hence, no prejudice has been shown. Indeed, counsel demonstrated effective assistance in winning an acquittal for his client on one of the counts.

■ Juno contends that he should have been given a suspended sentence because he was a first-time offender and because other first-time offenders had been so sentenced. Juno was sentenced to four concurrent two-year prison terms.

The imposition of a sentence, however, is a matter within the district court's wide discretion. *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). In general, appellate courts will not overturn or review the district court's imposition of a sentence within the statutory maximum. *United States v. Catch The Bear,* 727 F.2d 759 (8th Cir. 1984). Here the fact that others are receiving more lenient sentences for the same statutory crime does not demonstrate any abuse of that discretion. *See Clark v. Solem,* 693 F.2d 59 (8th Cir.1982) (no denial of equal protection in disparate sentences of codefendants), *cert. denied,* 460 U.S. 1090, 103 S.Ct. 1787, 76 L.Ed.2d 355 (1983).

Juno's contention that the government failed to prove that he had previously been a drug dealer challenges the weight of the evidence, not its sufficiency, and is without merit.

### IV.

In conclusion, we affirm the convictions of both Juno and Resnick on all counts.