# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1379

_____

United States of America

*Plaintiff - Appellee*

v.

Charleton Everett Maxwell

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Central

_____

Submitted: December 16, 2022
Filed: March 1, 2023

_____

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Charleton Maxwell was convicted of one count of conspiracy to distribute 50 grams or more of methamphetamine or 5 grams or more of actual, pure methamphetamine, two counts of distribution of heroin, and one count of distribution of heroin and methamphetamine. On appeal, he challenges the district

court's[1] denial of his motion for a new trial based on the introduction of a stipulation as to his codefendant's prior conviction, its refusal to give his requested jury instructions, and the sufficiency of the evidence on the conspiracy count. He also challenges the district court's calculation of his advisory sentencing guidelines range. We affirm.

## I.

In 2018, the Mason City, Iowa Police Department began investigating a drug organization led by Michael Graham. Law enforcement learned about the drug organization through a traffic stop of Graham's cousin, Keith Tucker, who was found with 297.9 grams of heroin. After some investigation, law enforcement suspected that Graham employed Bernard Davis, Antione Maxwell, Charles Maxwell, and Charleton Maxwell to sell drugs. Charles and Antione are Charleton's children, and Michael Graham and Bernard Davis are the maternal half-brothers of Charles and Antione. The investigation lasted for about two years.

During the investigation, law enforcement surveilled Michael Graham's residence, several addresses that Bernard Davis frequented, and Charles Maxwell and Charleton Maxwell's shared residence, 519 Eighth Street Southeast. While conducting surveillance, Cerro Gordo County Sheriff's Office Investigator Frank Hodak, who was part of the North Central Iowa Narcotics Task Force, observed Charleton Maxwell roughly 50 or 100 times. Charleton Maxwell was seen at Davis's residence and Graham's residence about once a week.

In December 2019, law enforcement conducted three controlled buys from Charleton Maxwell. A confidential informant ("CI") purchased the drugs. On December 5, 2019, the CI purchased 0.21 grams of heroin for $100; on December 6,

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

he purchased 0.16 grams of heroin for $50 and an 8-ball of methamphetamine[2] (3.5 grams) for $180; and on December 13, he purchased 0.46 grams of heroin for $300.

Law enforcement also conducted controlled buys from other individuals that they suspected were involved in the drug organization. On April 13, 2020, the CI attempted to purchase drugs from Davis, but Davis directed the CI to Antione Maxwell, who sold him 6.78 grams of methamphetamine. On April 14 and 16, the CI bought, respectively, 28.03 grams and 52.81 grams of methamphetamine from Antione Maxwell.

Following the controlled buys, Investigator Hodak spoke with a member of the drug organization who was then in jail, Armondo Grays. Grays had received methamphetamine and heroin from Graham to resell. Grays provided information to law enforcement about who was involved in the drug organization and their roles.

Later that month, Investigator Hodak obtained search warrants for several locations identified during the investigation, including Charles Maxwell and Charleton Maxwell's shared residence, 519 Eighth Street Southeast. There, law enforcement found heroin, marijuana, packaging materials, handgun ammunition, and more than $4,500 in cash. From Davis's residence, law enforcement recovered just under 3 pounds of methamphetamine and about 80 grams of heroin. From Graham's residence, law enforcement recovered heroin.

Charleton Maxwell was arrested in March 2021. He was indicted for one count of conspiracy to distribute 50 grams or more of methamphetamine or 5 grams or more of actual, pure methamphetamine, *see* 21 U.S.C. §§ 841(a)(1) and 846; two counts of distribution of heroin, *see* §§ 841(a)(1) and 841(b)(1)(C); and one count of distribution of heroin and methamphetamine, *see* §§ 841(a)(1) and 841(b)(1)(C).

---

[2]Investigator Hodak later testified that an 8-ball is an amount of methamphetamine commonly purchased for distribution as opposed to personal use.

His son, Antione Maxwell, was jointly charged with drug-related offenses, and they had a joint trial.

Charleton Maxwell requested that the jury be instructed that a conspiracy to distribute cannot be established between only the defendant and a government agent, that a buyer-seller relationship does not establish a conspiracy, and that a defendant must have knowledge of both the drug type and quantity as an element of the conspiracy. The district court refused. Additionally, he objected to the introduction of a stipulation agreed to by the Government and Antione Maxwell as to Antione Maxwell's prior conviction. The objection was overruled.

At trial, Investigator Hodak, Charleyann Mullen (a drug customer), the CI, Grays, and additional law-enforcement officers testified. Investigator Hodak testified about the two-year investigation into the drug organization, including the surveillance that was conducted, the controlled drug buys, and the searches of the addresses associated with the organization's members.

Grays and Mullen both testified that they purchased drugs from Charleton Maxwell and other members of the drug organization. Grays, who entered a cooperation plea agreement with the Government, testified that he purchased 4 ounces of methamphetamine at a time from Charleton Maxwell on four separate occasions, which Grays resold. Grays saw Charleton Maxwell sell heroin and methamphetamine at the Eighth Street residence and repackage methamphetamine for resale. In addition to purchasing drugs from Charleton Maxwell, Grays also purchased heroin from Graham and Davis and supplied Antione Maxwell with methamphetamine twice.

Mullen, a regular user of methamphetamine and heroin, testified that she purchased drugs from Charleton Maxwell at his Eighth Street residence. From about August 2019 to April 2020, she purchased heroin and methamphetamine from him daily or sometimes twice a day, for a total of 150 to 200 times. She would often purchase an 8-ball of methamphetamine from him, and, in the last year of her use,

she spent on average $300 to $500 a day on drugs. Once, she purchased $2,400 of methamphetamine from him. Although she mostly acquired the drugs for personal use, occasionally she bought them for other people or resold them.

Mullen, Grays, and the CI testified at trial about the workings of the drug organization. All three said that Graham was the leader of the organization, and Mullen and the CI testified that Davis, Antione Maxwell, and Charleton Maxwell worked under Graham. Both Grays and Mullen testified that Davis or Graham would send them to purchase drugs from Charleton Maxwell.

Mullen also testified about an incident where Charleton Maxwell drew a gun on her. She bought half a pound of methamphetamine from him, but she later realized he had given her only a quarter of a pound. When she went to his house to confront him about the discrepancy, he drew a gun, told her to get off his porch, and said he did not want to have to shoot her. As she left, she heard two gunshots.

Charleton Maxwell moved for judgment of acquittal on the conspiracy count. The district court denied the motion. The jury convicted Charleton Maxwell of all four counts in the indictment. He then moved for a new trial based on the admission of Antione Maxwell's stipulation, the district court's denial of his requested jury instructions, and the insufficiency of the evidence to support the conspiracy count. He also renewed his motion for a judgment of acquittal. The district court denied the motions.

The presentence investigation report ("PSR") recommended that under U.S.S.G. § 2D1.1(c) Charleton Maxwell be held accountable for distributing 23.23 grams of heroin (converted to 23.23 kilograms) and 737.07 grams of methamphetamine (converted to 14,741.40 kilograms), resulting in a base offense level of 34. *See* § 2D1.1, cmt. n.8(D) (explaining that 1 gram of heroin is converted to 1 kilogram and 1 gram of methamphetamine is converted to 2 kilograms). The PSR also recommended a two-level sentence enhancement for the use of a firearm while committing a drug offense. *See* § 2D1.1(b)(1). Charleton Maxwell objected

to the drug-quantity determination and the application of the firearm enhancement. The district court found that a preponderance of the evidence supported the drug quantity and the firearm enhancement. With a criminal-history category of II, a total offense level of 36, and a guidelines range of 210 to 262 months, the district court sentenced him to 210 months' imprisonment. Charleton Maxwell appeals his convictions and sentence.

## II.

We begin with Charleton Maxwell's challenge to the district court's denial of his motion for a new trial. He argues that (1) the district court abused its discretion in allowing the Government to introduce a stipulation as to Antione Maxwell's prior drug conviction, (2) the district court abused its discretion in refusing to give his requested jury instructions relating to the conspiracy count, and (3) there is insufficient evidence to convict him of conspiracy to distribute methamphetamine because the Government's drug-user witnesses, Mullen and Grays, are not credible and their testimony was uncorroborated.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[A] motion for new trial based on the weight of the evidence is generally disfavored, and the district court's authority to grant a new trial should be exercised sparingly and with caution." *United States v. Fazio*, 487 F.3d 646, 655 (8th Cir. 2007). "We review the district court's denial of a motion for a new trial for abuse of discretion." *United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001).

### A.

First, Charleton Maxwell argues that the district court abused its discretion in allowing the stipulation of Antione Maxwell's prior drug conviction to be read to the jury because the probative value of the stipulation was substantially outweighed

by the danger of unfair prejudice to Charleton Maxwell.[3]  We review the district court's evidentiary rulings for abuse of discretion.  *United States v. Splettstoeszer*, 956 F.3d 545, 547 (8th Cir. 2020).

The district court did not abuse its discretion in admitting Antione Maxwell's prior drug conviction.  Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  "It is a simple fact of joint trials that some evidence is relevant to and admissible against only some defendants."  *United States v. Delpit*, 94 F.3d 1134, 1147 (8th Cir. 1996).  Here, Charleton Maxwell has not explained how or shown that the stipulation was unfairly prejudicial to him.  *See United States v. Lara*, 891 F.2d 669, 672 (8th Cir. 1989) (concluding that the admission of a codefendant's prior convictions was not prejudicial to the other codefendant when there was no evidence of prejudice).  The stipulation applied only to Antione Maxwell, and the jury was instructed to consider the charges against each defendant separately.  *Cf. United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002) ("Any concern that the evidence implicating the other codefendants would spill over and prejudice [this defendant] was minimized by the district court's instruction to the jury to view the evidence presented against one defendant as applicable to only that defendant.").

B.

Second, we address Charleton Maxwell's challenges to the jury instructions, all of which relate to only the conspiracy count.  He argues that the district court should have instructed the jury that a conspiracy cannot be established between only the defendant and a government agent, that a buyer-seller relationship does not

---

[3]In his reply brief, Charleton Maxwell argues that the introduction of the stipulation raises Sixth Amendment concerns.  Because he did not raise this argument in his opening brief, it is waived.  *See United States v. Grace*, 893 F.3d 522, 525 (8th Cir. 2018).

establish a conspiracy, and that a defendant must have knowledge of the drug type and quantity as an element of conspiracy.

"We review for abuse of discretion the district court's formulations of jury instructions." *United States v. Mitchell*, 613 F.3d 862, 867 (8th Cir. 2010). In determining whether the district court abused its discretion, the test is "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *United States v. Carlson*, 810 F.3d 544, 554 (8th Cir. 2016). "A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law." *United States v. Faulkner*, 636 F.3d 1009, 1020 (8th Cir. 2011). If the district court failed to properly instruct the jury, we will reverse only if the error was prejudicial. *United States v. Mitchell*, 613 F.3d at 867. We conclude that the district court did not abuse its discretion in rejecting the requested jury instructions.

1.

First, an instruction that a conspiracy cannot be established between only the defendant and a government agent, though a proper statement of the law, was not supported by the evidence. *See United States v. Pinque*, 234 F.3d 374, 378 (8th Cir. 2000) (noting that "there can be no indictable conspiracy involving only the defendant and government agents and informers"). At trial, the Government did not rely solely on the CI's purchase of drugs from Charleton Maxwell to establish a conspiracy. Rather, the Government presented evidence that Charleton Maxwell conspired with Graham, Davis, Antione Maxwell, Grays, and Mullen to sell methamphetamine. Mullen and Grays testified that Charleton Maxwell sold resale quantities of methamphetamine to them, Davis or Graham directed buyers to purchase methamphetamine from Charleton Maxwell, Davis communicated with Graham about selling methamphetamine, and Charleton Maxwell worked under Graham. Further, Investigator Hodak testified that Charleton Maxwell was regularly seen at Davis's and Graham's residences, and law enforcement found a large amount

of methamphetamine at Davis's residence. Finally, Grays testified that he saw Charleton Maxwell repackaging pounds of methamphetamine for resale. In sum, there was extensive evidence that a conspiracy to sell methamphetamine existed between Charleton Maxwell and multiple non-government agents. Therefore, the district court did not abuse its discretion in refusing to adopt a government-agent instruction.

2.

Second, the district court did not abuse its discretion in refusing to instruct the jury that a buyer-seller relationship does not establish a conspiracy because the evidence does not support the instruction. "[T]he crime of conspiracy requires a concert of action among two or more persons for a common purpose," so "the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." *United States v. Prieskorn*, 658 F.2d 631, 634 (8th Cir. 1981). The buyer-seller instruction "is appropriate when the facts indicate a single transaction case involving small quantities of drugs consistent with personal use." *United States v. Conway*, 754 F.3d 580, 592 (8th Cir. 2014) (internal quotation marks omitted). "[It] is inappropriate where there is evidence of multiple drug transactions, as opposed to a single, isolated sale." *Id.*

Like *Conway*, this case does not involve a "one-time buyer who purchased a small amount of [drugs] for personal use." *See id.* Rather, this case involves "the interactions of members of a drug-distribution network over [at least two years]." *See id.* Mullen testified that she bought methamphetamine 150 or 200 times from Charleton Maxwell, including resale quantities of methamphetamine. Grays and the CI also testified that they purchased resale quantities of methamphetamine from Charleton Maxwell and that Graham or Davis would direct buyers to purchase methamphetamine from Charleton Maxwell. Grays further testified that he saw Charleton Maxwell repackaging pounds of methamphetamine for resale. Lastly, law enforcement frequently saw Charleton Maxwell at Davis's and Graham's residences,

-9-

and a large amount of methamphetamine was found at Davis's residence.  In sum, a buyer-seller instruction was not appropriate here.

3.

Third, the district court did not abuse its discretion in refusing to instruct the jury that the defendant must have knowledge of the drug quantity and type to establish a conspiracy to distribute methamphetamine because it is an incorrect legal statement.  Although facts that increase the penalty for a crime beyond the statutory maximum must be proved beyond a reasonable doubt, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the government is not required to prove a defendant's knowledge of the drug quantity or type for him to be convicted under §§ 841(a) and 841(b).  *United States v. Sheppard*, 219 F.3d 766, 768 n.2 (8th Cir. 2000); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 699-700 (5th Cir. 2003); *see also United States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016).  Additionally, "to obtain a conviction and a particular sentence for conspiracy to distribute controlled substances under § 846, the government must prove only that the defendant's mental state was the same as if the defendant had been charged with the underlying offense." *United States v. Collazo*, 984 F.3d 1308, 1333 (9th Cir. 2021).  Thus, the Government did not need to prove that Charleton Maxwell had knowledge of the drug quantity or type to convict him of conspiracy to distribute methamphetamine. *See United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001) (holding under *Apprendi* that to convict a defendant of violating § 846 the jury need not find that the defendant had knowledge of the drug quantity and type).

C.

Lastly, Charleton Maxwell challenges the sufficiency of the evidence for the conspiracy-to-distribute count.  We review the district court's denial of a motion for a new trial for abuse of discretion and reverse "only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *United States v. Walker*, 393 F.3d 842, 848 (8th Cir. 2005); *see* Fed. R. Crim. P. 33(a).

"Unlike a motion for acquittal, which requires the district court to consider all evidence in the light most favorable to the guilty verdict, a court considering a new trial motion is free to evaluate the evidence and credibility of the witnesses." *United States v. Hilliard*, 392 F.3d 981, 987 (8th Cir. 2004).

"To establish that a defendant conspired to distribute drugs, the government must show that there was an agreement to distribute drugs, that the defendant knew of the conspiracy, and that the defendant intentionally joined the conspiracy." *United States v. Ramirez*, 21 F.4th 530, 532 (8th Cir. 2021). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." *Id.* at 532-33. Evidence that a defendant "associated with other members of the conspiracy . . . supports an inference of his participation." *Conway*, 754 F.3d at 588. And "[e]vidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute." *United States v. Peeler*, 779 F.3d 773, 776 (8th Cir. 2015). "[T]he uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it is not otherwise incredible or unsubstantial on its face." *United States v. Resnick*, 745 F.2d 1179, 1185 (8th Cir. 1984).

We agree with the district court that there was sufficient evidence to convict Charleton Maxwell of conspiracy to distribute methamphetamine. There is evidence of multiple sales of resale quantities of methamphetamine. Both Mullen and Grays testified they bought resale quantities of drugs from Charleton Maxwell, which is corroborated by the CI's purchases from Charleton Maxwell. Mullen testified she purchased 8-balls of methamphetamine, Grays testified he purchased 4 ounces of methamphetamine, and the CI testified he purchased an 8-ball of methamphetamine. Grays also testified that he saw Charleton Maxwell sell methamphetamine at the Eighth Street residence and repackage methamphetamine to be resold, supporting the testimony that Charleton Maxwell sold resale quantities of methamphetamine.

Further, there is evidence that Charleton Maxwell "associated with other members" of the drug organization, which "supports an inference of his

participation." *See Conway*, 754 F.3d at 588. Grays, Mullen, and the CI testified that Graham was the leader of the drug organization, and Mullen and the CI testified that Davis, Antione Maxwell, and Charleton Maxwell worked under Graham. Mullen and Grays both testified that Davis directed purchasers to Charleton Maxwell. The CI similarly testified that Davis directed him to purchase drugs, albeit from Antione Maxwell. Finally, Investigator Hodak testified that Charleton Maxwell was regularly seen at the residences of Graham and Davis.

To be sure, as Charleton Maxwell points out, law enforcement never saw Mullen or Grays at Charleton Maxwell's residence. But Investigator Hodak testified that officers were not constantly surveilling and were pursuing other tasks throughout the investigation. We conclude that Mullen's and Grays's testimony is not incredible or unsubstantial. *See Resnick*, 745 F.2d at 1185. Based on the evidence that Charleton Maxwell sold resale quantities of methamphetamine to multiple individuals and associated with other members of the drug organization, we conclude that there was sufficient evidence to convict him of conspiracy to distribute methamphetamine.

\*     \*     \*

In sum, the district court did not abuse its discretion in allowing the stipulation to be introduced or in rejecting Charleton Maxwell's proposed jury instructions, and there was sufficient evidence to convict him of conspiracy to distribute. Thus, the district court did not abuse its discretion in denying Charleton Maxwell's motion for a new trial.

## III.

Charleton Maxwell also challenges his sentence. He argues that (1) the drug quantities used to determine his base offense level must be found by at least clear and convincing evidence, (2) alternatively, the district court clearly erred in its calculation of the drug quantities attributable to Charleton Maxwell, and (3) the

district court clearly erred in applying a sentence enhancement for the use of a dangerous weapon while committing the offense, *see* § 2D1.1(b)(1).

## A.

First, we address whether due process requires that the drug quantities used to calculate the base offense level under § 2D1.1 be found by clear and convincing evidence. We review *de novo* constitutional challenges to a sentence. *United States v. Wade*, 435 F.3d 829, 831 (8th Cir. 2006). Our precedent forecloses the argument that drug quantities must be found by a standard higher than preponderance of the evidence. *See United States v. Villareal-Amarillas*, 562 F.3d 892, 895-98 (8th Cir. 2009). Thus, the district court did not err in applying the preponderance-of-the-evidence standard to determine the drug quantities attributable to Charleton Maxwell.

## B.

Second, we turn to whether the district court clearly erred in its calculation of the drug quantities attributable to Charleton Maxwell. "We review for clear error a district court's drug quantity calculation." *United States v. Payton*, 636 F.3d 1027, 1046 (8th Cir. 2011). Section 2D1.1(c) establishes the base offense level for defendants convicted of violating § 841(a)(1). An offense involving at least 10,000 kilograms but less than 30,000 kilograms of converted drug weight has a base offense level of 34. § 2D1.1(c)(3); *see* § 2D1.1(c), Note (K) (explaining what converted drug weight means). "Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level." § 2D1.1, cmt. n.5 (citing U.S.S.G. § 1B1.3(a)(2)). Under § 1B1.3(a)(2), a defendant "may be held responsible" for "all acts . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."

"When the quantity of drugs that the government seized does not reflect the scale of the drug trafficking offense, then the sentencing court must approximate the

quantity of the controlled substance for sentencing purposes." *Payton*, 636 F.3d at 1047 (internal quotation marks omitted); *see* § 2D1.1, cmt. n.5. "The court may make a specific numeric determination of quantity based on imprecise evidence." *Payton*, 636 F.3d at 1047. "When calculating drug quantity in the context of a narcotics trafficking conspiracy, the sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." *Id.* at 1046. "Coconspirators' testimony may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." *Id.* (internal quotation marks omitted). The district court's assessment of a witness's credibility "is almost never clear error given that court's comparative advantage at evaluating credibility." *Id.* at 1047.

The district court did not clearly err in calculating the drug quantity involved in Charleton Maxwell's offense. The district court's quantity determination was largely based on Mullen's and Grays's testimony. The district court found Mullen and Grays to be credible, and we find no reason to overturn that finding. As the district court explained, the drug quantities that Mullen and Grays attributed to Charleton Maxwell were consistent with the large amount of methamphetamine found in Davis's residence, the amount of heroin and methamphetamine sold to the CI in quick succession, and the amount of methamphetamine sold to the CI by Charleton Maxwell's son over just four days. Additionally, two of the other members of the drug organization, Tucker and Davis, were found with large amounts of drugs. Even though Mullen did not testify about the amount of heroin she usually purchased, the district court did not clearly err in estimating the amount she purchased based on how much she spent on heroin and methamphetamine (on average $300 to $500 per day) and the average amounts of heroin sold to the CI. *See id.* at 1047. Thus, the district court did not clearly err.

## C.

Lastly, we address the district court's application of the firearm enhancement under § 2D1.1(b)(1). We review the district court's factual finding that a defendant

possessed a firearm while committing a drug-trafficking offense for clear error. *See United States v. Savage*, 414 F.3d 964, 966 (8th Cir. 2005). "The sentencing guidelines provide for a two-level increase in offense level in a drug-trafficking case '[i]f a dangerous weapon (including a firearm) was possessed.'" *United States v. Renteria-Saldana*, 755 F.3d 856, 859 (8th Cir. 2014) (quoting § 2D1.1(b)(1)). "The enhancement 'should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.'" *Id.* (quoting § 2D1.1(b)(1), cmt. n.11(A)). "Thus, the government must show that (1) the gun was possessed and (2) it was not clearly improbable that the weapon was connected to the drug offense." *Id.* (internal quotation marks omitted).

The district court did not clearly err in applying the firearm enhancement based on Mullen's testimony. It found Mullen credible, and that finding is virtually unreviewable on appeal. *See United States v. Cervantes*, 929 F.3d 535, 539 (8th Cir. 2019). Mullen testified that she went to Charleton Maxwell's house to confront him about the discrepancy between the methamphetamine she paid for and received, and he drew a gun, told her to get off his porch, and said he did not want to have to shoot her. As she left, she heard two gunshots. Mullen's story is corroborated by the fact that law enforcement found ammunition in Charleton Maxwell's residence. Thus, it was not clear error to find that he possessed the gun and that the gun was connected to his drug-trafficking offenses. [4]

**IV.**

For the foregoing reasons, we affirm Charleton Maxwell's convictions and sentence.

————————————————

---

[4]Charleton Maxwell does not meaningfully argue that his sentence is substantively unreasonable, so we treat that argument as waived. *See United States v. Ruzicka*, 988 F.3d 997, 1013 n.7 (8th Cir. 2021).