# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3288

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| David A. Payton, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 23, 2010
Filed: February 25, 2011

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

David A. Payton appeals his convictions and sentences for conspiracy to manufacture, distribute, and possess with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) ("Count 1"); opening and maintaining a crack house, in violation of 21 U.S.C. § 856(a)(1) ("Count 5"); and distribution of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 ("Count 6"). Payton asserts that (1) the district court[1] erred in denying his motion to sever the case for trial; (2) the district court erred in

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

denying his *Batson*[2] challenge; (3) he is entitled to a new trial because the government withheld exculpatory evidence; (4) the district court abused its discretion in denying his requested jury instructions; (5) insufficient evidence exists to support his convictions; (6) the district court erred in determining the drug quantity attributable to him; (7) the district court erred in applying an aggravating role enhancement; and (8) the district court abused its discretion in denying a sentencing variance based upon the disparity in the Guidelines between powder cocaine and crack cocaine. We affirm.

## I. *Background*

David A. Payton, along with Sidney Glennard Hines, Durrell Ryan Parks, and William Carl Morgan, was charged in a multi-count indictment with conspiracy to manufacture, distribute, and possess with intent to distribute crack cocaine, opening and maintaining a crack house, and distribution of crack cocaine (Counts 1, 5, and 6). Prior to trial, the government filed an information and notice of prior conviction, informing Payton that he was subject to a sentencing enhancement for a prior felony drug conviction. Also prior to trial, Morgan and Parks entered guilty pleas pursuant to plea agreements and agreed to cooperate against Payton and Hines at trial.

Payton and Hines were tried jointly. The government produced the following evidence to support the charges at trial. On January 30, 2008, the Iowa City Police Department's "Street Crimes Unit" began focusing on Hines in a drug investigation. The police had purchased drugs, which led them to the apartment of Michelle Nichols in Coralville, Iowa. That evening, the police conducted a search of Nichols's apartment and found crack cocaine, money, and other indicia of drug dealing. During the search, Hines arrived at the apartment and was searched. Hines possessed a small amount of crack cocaine, a digital scale, a cell phone, and $1,190, including $200 of the "buy" money from a transaction conducted earlier in the evening. Hines had been

---

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986).

selling crack cocaine in Iowa City, Iowa, and had delivered crack cocaine to Nichols earlier that evening.

Hines also distributed crack cocaine in Davenport, Iowa, to Willie Hester, Morgan, Parks, Charlena Castle, and others. Hines was a supplier to Hester, a crack dealer. On April 3, 2008, Davenport police raided Hester's residence, recovering approximately six grams—15 individually wrapped "rocks"—of crack cocaine, packaging material, and $563.

On August 30, 2008, the Davenport police raided Hester's new residence, where Hester and Castle were present. Officers discovered 44 individually wrapped rocks of crack cocaine, Hester's cell phone, and $676. While officers were still at Hester's residence, Hester, directed by police, called Hines and said, "I have your money—I sold out." Hester then received two phone calls from Hines, who advised Hester that he was on his way to Hester's residence. After the second call, Hines approached on foot and was intercepted by the police. Hines possessed a cell phone with the same telephone number that Hester had just called. Hester was arrested and jailed, but Hines was arrested and released.

Castle introduced Hester to Hines in 2007. Castle knew that Hines was a crack dealer, and she thought that Hester could obtain better prices from Hines for crack cocaine. Castle had observed Hines with ounce quantities of crack cocaine. Hester estimated that Hines had supplied him with 50 to 100 rocks of crack cocaine on approximately 25 to 30 separate occasions. Hester met Payton when Hines brought Payton with him to Hester's home.

Payton distributed crack cocaine to Rhonda Cowan, Parks, Castle, Leslie Lueders, and others. Between August 2008 and December 18, 2008, Hines and Payton sold crack cocaine together. Payton provided a cell phone to Hines, which Hines then

used to conduct his drug business. Payton also received Supplemental Security Income (SSI) and spent all of his $650 SSI checks on crack cocaine.

In October 2008, Payton used Michael Bowes's apartment to distribute crack cocaine. The police received complaints about drug dealing from Bowes's apartment. On October 19, 2008, Davenport police asked Lueders to go to Bowes's apartment with a $50 bill to see if she could purchase crack cocaine. Lueders met Payton at the apartment and paid him $50 for crack cocaine. During the transaction, Payton revealed a "wad of dope," placing it on the table for Lueders to choose. When Lueders picked up a rock, Bowes took a small piece of it for himself. Lueders left the apartment and gave the police a description of Payton.

After the sale, the police apprehended Payton outside of the apartment building. He possessed the $50 bill that Lueders had given him and a cell phone. A records check of the cell phone revealed numerous calls between Payton's cell phone and the phone that Hines used, including calls that evening.

In October or November 2008, Payton and Hines began using Parks's apartment to distribute crack cocaine. On December 18, 2008, Morgan, while working under the direction of Davenport Detective Gilbert Proehl, arranged to purchase $300 worth of crack cocaine from Hines. Prior to the purchase, the police equipped Morgan with an audio and video recording device and gave him $300 in prerecorded funds to use for the purchase. Then, Morgan placed recorded calls to Hines, and Hines advised Morgan to meet him at Parks's apartment. Payton met Morgan at the door of the apartment building and followed him up the stairs to Parks's apartment. A short time later, Morgan met Detective Proehl and gave him 20 individually wrapped rocks of crack cocaine.

The police obtained a search warrant for Parks's apartment and executed the search that evening. After forcefully entering the apartment, the police discovered

Hines in the bathroom attempting to flush evidence down the toilet. The police found $300 from the earlier drug transaction on Hines after his arrest. In the toilet, officers discovered six individually wrapped rocks of crack cocaine, a broken cell phone, two rocks of crack cocaine inside the vacuum tube of the toilet, and a $10 bill in the sewage line directly under the toilet. The police found another rock of crack cocaine on the floor of the apartment, along with items used to cut and package crack cocaine. On the ground outside the window of the apartment, officers discovered packaging material, latex gloves, and baggie remnants.

At trial, Hines testified that he is a crack user, not a crack dealer, and that he works for a construction company from time to time. He admitted to meeting Payton in September 2008. He also admitted that on December 18, 2008, he used Payton's cell phone to contact Morgan.

Payton also testified, admitting that he had been a crack user for 14 years, had a very bad crack habit from 2007 to 2008, and had smoked crack "all day, everyday." According to Payton, he was recently diagnosed as schizophrenic and began receiving SSI as a result. He received $650 each month in SSI checks, and he used all of the money to buy crack cocaine. He stated that he usually purchased crack cocaine in $50 amounts but sometimes in $20 amounts. Payton said that he shared the crack cocaine with others on many occasions. Payton testified that he traded his property for crack cocaine and sold cell phones for crack cocaine, one time receiving two $20 rocks for a phone. Payton acknowledged that a $20 rock is .2 grams of crack cocaine and that a $50 rock is a half of a gram of crack cocaine.

Payton admitted to using crack cocaine with Cowan, Parks, Bowes, and Rocky Wales. According to Payton, on October 18, 2008, Bowes and Payton reached an agreement that Payton would buy $50 worth of crack cocaine for them to share. He also testified that he went to Parks's apartment on numerous occasions to get crack cocaine and that he knew a lot of people came to Parks's apartment to get "high." He

said that Parks would "run" for the drugs. To explain how Hines's phone number appeared on his cell phone in August and September 2008, Payton stated that he let people use his cell phone to order crack cocaine. Payton denied knowing Hester and Castle.

As to the December 18, 2008 raid at Parks's apartment, Payton claimed that he was in the apartment building to smoke crack cocaine and not as part of any arrangement with Hines or Parks. He admitted that he saw Morgan come into the building and that he followed Morgan to Parks's apartment. Payton maintained that he did not see Hines in the apartment for a while; he said that he only saw Parks with crack cocaine. According to Payton, after Morgan left, Payton saw Hines come out of the kitchen. Payton stated that Hines never went into the bathroom that evening.

After a seven-day trial, the jury found Payton guilty on all counts.

## II. *Discussion*

On appeal, Payton argues that (1) the district court erred in denying his motion to sever the case for trial; (2) the district court erred in denying his *Batson* challenge; (3) he is entitled to a new trial because the government withheld exculpatory evidence; (4) the district court abused its discretion in denying his requested jury instructions; (5) insufficient evidence exists to support his conviction; (6) the district court erred in determining the drug quantity attributable to him; (7) the district court erred in applying an aggravating role enhancement; and (8) the district court abused its discretion in denying a sentencing variance based upon the disparity in the Guidelines between powder cocaine and crack cocaine.

### A. *Motion To Sever*

Before trial commenced, Payton filed a motion to sever his trial from Hines based on antagonistic defenses. The district court denied the motion "subject to renewal," noting that it "will hear that [motion] again at the close of all of the

evidence." At the close of evidence, Payton's counsel "renew[ed] the motion to sever, based on the argument that the defenses are inconsistent." The district court denied the motion for severance.

On appeal, Payton asserts that his "defense was that he was not part of Hines's activities, and if they were in the same place together, it was only because Payton was there to 'get high.'" In turn, Hines's defense was to deny everything, as he "claimed he only came to the Quad Cities occasionally," "said he bought from, but didn't sell to, Willie Hester and Michelle Nichols," and "claimed the transaction on December 18th with William Morgan was Morgan and Parks's deal, and that he helped only to get a personal use quantity of crack, plus some cash." Payton contends that these two defenses are antagonistic because to acquit both defendants, the jury would have to believe both Hines's and Payton's testimony, which is impossible. Furthermore, Payton asserts that the extensive evidence presented about Hines's activities in early 2008 prejudiced Payton because the jury could find Payton guilty by association. Finally, he argues that if he had been tried after Hines, he could have called Hines as a witness.

In response, the government argues that Payton admitted that he is addicted to crack cocaine and that he shared it with others, but he maintained that he was not a drug dealer. Likewise, Hines testified that he is a crack user, not a dealer. According to the government, Hines's testimony did not undermine Payton's defense and, in fact, actually supported it. For example, both Payton and Hines identified Parks as a drug dealer and admitted being in Parks's apartment on December 18, 2008. Hines denied distributing drugs and never implicated Payton in the conspiracy. Similarly, Payton's contention that he was only a crack user was not antagonistic to Hines's defense; Payton corroborated Hines's story that Hines did not enter the bathroom where the crack cocaine and cell phone were found in the toilet. As a result, the government maintains that Payton has failed to show prejudice in the district court's denial of his motion for severance.

"We will not reverse a denial of a motion to sever unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." *United States v. Sandstrom*, 594 F.3d 634, 642 (8th Cir. 2010) (internal quotation and citation omitted). Two defendants may properly be tried together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *Id.* at 644 (internal quotations and citations omitted). The present case satisfies this standard, "and no one contends otherwise, so there is no issue of misjoinder in violation of Rule 8. The claim is, instead, that the joinder was prejudicial, and that the District Court should have granted a severance under Fed. R. Crim. P. 14." *Id.* (internal quotation and citation omitted). According to Rule 14(a):

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

A court will permit severance only "upon a showing of real prejudice to an individual defendant." *Sandstrom*, 594 F.3d at 644 (internal quotation and citation omitted). "Whether to grant a motion to sever is left to the discretion of the trial court, and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown." *Id.* (internal quotation and citation omitted). Prejudice to the defendant must be both "real" and "clear"; as a result, "an abuse of discretion in refusing severance is not alone enough to justify reversal and a new trial." *Id.* (internal quotation, alteration, and citation omitted). A demonstration of prejudice requires the defendant to demonstrate "some appreciable chance that [he] would not have been convicted had the separate trial [he] wanted been granted." *Id.* (internal quotation and citation omitted). "That is, the defendant must show something more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial." *Id.* (internal quotation and citation omitted). To satisfy the real

-8-

prejudice standard, a defendant may show "that his defense is irreconcilable with the defense of his codefendant or that the jury will be unable to compartmentalize the evidence as it relates to separate defendants." *Id*. (internal quotation, alteration, and citation omitted). "The defendant carries a heavy burden in making this showing." *Id*. (internal quotation and citation omitted).

Here, Payton asserts that his defense and Hines's defense were mutually antagonistic. "Antagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*." *Id*. (internal quotations and citation omitted). Severance is not mandated "whenever codefendants have conflicting defenses." *Id*. (internal quotation and citation omitted). In fact, Rule 14 provides that, if a defendant establishes prejudice, the district court may exercise its discretion in tailoring the appropriate relief. *Id*.

We concur in the district court's determination that Payton's and Hines's defenses do not even qualify as mutually antagonistic. Neither Payton nor Hines accused the other of being the actual crack dealer; instead, they both maintained that they were merely crack users. Furthermore, their defenses supported one another, as they both identified Parks as the crack dealer. At no time did Payton or Hines implicate the other as the crack dealer; in fact, Payton corroborated Hines's contention that he did not enter the bathroom where officers discovered the crack cocaine and cell phone in the toilet.

Additionally, we reject Payton's assertion that evidence of Hines's activities in early 2008 prejudiced him by making him "guilty by association." "Severance is not required merely because evidence that is admissible only against some defendants may be damaging to others." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004) (internal citation omitted). Here, the government presented evidence to the jury that the police apprehended Payton, Hines, and Parks in a drug operation on December 18, 2008. The government also presented evidence that both Payton and Hines were

caught with "buy" money and cell phones used to call one another and other drug dealers and users during the course of the operation.

Finally, we reject Payton's assertion that, if he had been tried separately from Hines, he could have called Hines as a witness because Hines *actually testified* and was subject to examination during trial.

Therefore, we hold that the district court did not abuse its discretion in denying Payton's motion to sever.

### B. Batson *Challenge*

Prior to trial, the parties agreed to permit the magistrate judge to select the jury. During voir dire, the magistrate judge asked all the prospective jurors whether they knew any of the lawyers or the defendants. One juror stated that he knew Payton's counsel and her husband. Payton's counsel confirmed that the juror knew her and her husband. According to the juror, the "acquaintanceship" was "work related," as he worked with defense counsel's husband six years ago. The magistrate judge then asked the juror if that prior working relationship or acquaintanceship with counsel and her husband would impair his ability to be fair and impartial. The juror replied, "No, sir."

Thereafter, the government used one of its peremptory challenges to excuse the juror. This was the government's sixth and last challenge. Payton's counsel and Hines's counsel then lodged a *Batson* challenge, claiming that the juror is "the only African-American on the jury." In response, the government asserted that there was "no racial component" to the challenge because the juror "worked with [Payton's counsel's] husband for a number of years." According to the government, the juror should not be put "in a position of having to vote against someone who [he] had worked with closely for a long time." Payton's counsel then argued that because the government failed to inquire of the juror "about how he knows [counsel and her husband] or what he knows about [counsel and her husband]," it "failed to present a neutral explanation

-10-

for the strike of [the juror]." The magistrate judge granted the *Batson* challenge and agreed to an immediate appeal to the district court.

The district court rejected the magistrate judge's determination after concluding that Payton had failed to show that the government's strike was motivated by racial discrimination.

On appeal, Payton asserts that the district court clearly erred in denying his *Batson* challenge because the government's proffered explanation for the strike—"that's not going to work for the government to have a juror who knows the defense attorney and her husband"—cannot constitute a race-neutral explanation in light of the government's failure to inquire of the juror about his relationship with counsel or her husband.

> The Equal Protection clause of the Fourteenth Amendment prohibits the use of peremptory challenges to strike jurors solely on the basis of race. *Doss v. Frontenac*, 14 F.3d 1313, 1316 (8th Cir. 1994) (citing *Batson*, 476 U.S. at 79, 106 S. Ct. 1712, and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)). If a party makes a prima facie showing that a peremptory challenge is race based, the proponent must show a race neutral justification to overcome the objection. *Id*. The district court then decides whether the objecting party has shown purposeful discrimination. *Id*. Since those factual findings turn largely on credibility evaluations, they are due great deference, *Batson*, 476 U.S. at 98 n. 21, 106 S. Ct. 1712, and our review is for clear error, *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990).

*United States v. Ellison*, 616 F.3d 829, 831–32 (8th Cir. 2010).

"When, as here, the government offered a nondiscriminatory explanation for the strikes and the court ruled on the ultimate question of purposeful discrimination, the preliminary *prima facie* issue arguably became moot." *United States v. Lewis*, 593

F.3d 765, 770 (8th Cir. 2010) (internal quotation, alteration, and citation omitted). Therefore, we will review "the district court's conclusion that the government's reasons for striking [the juror] were nondiscriminatory." *Id.*

Here, the district court did not clearly err in concluding that the government's reason for striking the juror—knowing defense counsel—was "legitimate and nondiscriminatory." *Id.* (holding that district court did not clearly err in finding that the government's proffered reasons for striking two African-American jurors were racially neutral where the government explained that it struck the jurors because they, inter alia, knew a defense witness). A juror's personal acquaintanceship with defense counsel is a race-neutral basis for concern about a juror's objectivity. Payton has failed to show that this reason served to merely disguise purposeful discrimination.

## C. *Exculpatory Evidence*

Prior to trial, the government provided Payton with a proposed witness list that included codefendant Morgan. Morgan pleaded guilty pursuant to a plea agreement on the afternoon before Payton's trial began. During voir dire, the district court asked counsel to advise the jury venire of the names of likely trial witnesses, and the government named Morgan as a potential witness. Although the government never called Morgan as a witness during trial, it did call Morgan as a witness during sentencing. Morgan testified that he was "brought to the courthouse for Mr. Hines'[s] and Mr. Payton's trial" "every day." He also stated that law enforcement officers interviewed him at the courthouse during that time. According to Morgan, he told the officers "that Mr. Payton was not involved in the crack cocaine deals" between Morgan and Hines.

Payton asserts that Morgan's testimony at the sentencing hearing constitutes exculpatory evidence favorable to Payton that the government failed to disclose. He contends that Morgan's "new" statement—that Payton was not involved in crack cocaine deals—was "unavailable" to him because counsel should not be expected to

investigate a case during the course of trial. According to Payton, the government made available to him reports and prior interviews concerning Morgan, but Morgan's "new" testimony contradicted those prior statements insofar as the new information further exonerated Payton.

In response, the government argues that Payton failed to properly preserve the issue for appeal and therefore waived it.

A thorough review of the record reveals that Payton never argued to the district court that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing Morgan's statements. Because Payton failed to raise his *Brady* claim before the district court, we review for plain error. *United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008). "To prevail on a plain error standard, [Payton] must show that the court committed an error that was plain, that affected his substantial rights, and that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotations and citations omitted).

The government commits a *Brady* violation where it suppresses evidence that is favorable to the accused that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Keltner*, 147 F.3d 662, 673 (8th Cir. 1998) (internal quotation and citation omitted). "To establish a *Brady* violation, a defendant is required to show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *Id.*

"On this record, [Payton] failed to establish a *Brady* violation, much less plain error by the district court." *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005). Payton cannot establish the first element because "[t]he record before the District Court on the suppression issue is insufficient to show the prosecution suppressed [Morgan's testimony]." *Keltner*, 147 F.3d at 673. Although Payton claims

that Morgan's testimony at sentencing conflicts with his earlier statements, those earlier statements are not part of the record. Nor was the government afforded the opportunity to question the interviewing agents about Morgan's pretrial statements. As a result, Payton cannot show that the government suppressed exculpatory evidence.

## D. *Jury Instructions*

Payton requested two jury instructions that the district court rejected—an "addict-informant" instruction and a "drug house" instruction.

We review a district court's jury instructions for an abuse of discretion. *United States v. Dvorak*, 617 F.3d 1017, 1024 (8th Cir. 2010). "In conducting such review, this court must determine whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Id.* (internal quotation and citation omitted).

### 1. *"Addict-Informant" Instruction*

Payton requested that the district court instruct the jury that

> [i]f a witness who has cooperated with the Government is or was a drug user, there are reasons his testimony should be considered with great care. A regular user of narcotics has a constant need for a supply of drugs and for money to support his habit, and also may have an abnormal fear of imprisonment in which his supply of drugs might be cut off. Additionally, a witness who was under the influence of drugs or alcohol at the time of a particular event, or at the time of their testimony, may have impaired recollection of that which occurred during that event. These are special circumstances which you may consider in weighing testimony of this kind. You, of course, may give the testimony such weight as you think proper after considering all relevant circumstances.

The district court rejected the instruction but did instruct the jury as follows with regard to witness credibility:

> In deciding what testimony of any witness to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, *the extent to which drug use or other conditions affected the ability of the witness to perceive the events testified about*, the witness's memory, *any motives that witness may have for testifying a certain way*, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

(Emphasis added.)

On appeal, Payton asserts that the district court erroneously declined his requested instruction because Castle, Cowan, and Parks were crack cocaine addicts in 2008.

In *United States v. Hoppe*, we "decline[d] to adopt . . . a per se rule, but rather align[ed] with those circuits holding that the circumstances of each case determine the need for an addict-informant instruction." 645 F.2d 630, 633 (8th Cir. 1981). We outlined the following factors as "obviat[ing] the need for an addict-informant instruction: a dispute as to whether the informant is actually an addict, cross-examination concerning the informant's addiction, an instruction alerting the jury that an informant's testimony should be viewed with care, and corroboration of the informant's testimony." *Id.* (internal citations omitted).

Here, the district court did not abuse its discretion in declining Payton's requested addict-informant instruction because (1) as Payton concedes, Castle, Cowan, and Parks were cross-examined about their drug addiction and (2) the district court instructed the jury that, in assessing the credibility of witnesses, it should

-15-

consider "the extent to which drug use or other conditions affected the ability of the witness to perceive the events testified about" and "any motives that witness may have for testifying a certain way." Payton, thus, could have argued effectively to the jury that the witnesses' credibility should be discounted due to their drug addiction.

## 2. *"Drug House" Instruction*

Payton also requested that the district court give the following "drug house" instruction:

> A Defendant opens or maintains a place for the purpose of manufacturing, distributing, or using crack cocaine if he maintains the place for the specific purpose, objective, or aim of manufacturing, distributing, or using the controlled substance. The specific purpose need not be the sole purpose for which the place is used, but it must be one of the primary or principal uses of the place.
>
> A particular Defendant must personally have the specific purpose; it is not sufficient for others to have that purpose.
>
> A Defendant has the required specific purpose if he acted as a supervisor, manager, or entrepreneur in a drug enterprise, but not if he merely facilitated the crime.
>
> The Defendant must have a substantial connection to the place, and he must be more than a casual visitor. He must exercise dominion and control over the premises. You may consider acts such as control, duration, acquisition of the place, renting or furnishing the place, performing repairs, supervising, protecting, supplying food to those present, and continuity as evidence that a Defendant knowingly opened or maintained a place for the specific purpose of manufacturing, distributing or using crack cocaine there.

The district court rejected the instruction and instead modeled its instruction after Eighth Circuit Model Criminal Instruction 6.21.856A. The instruction provided as follows:

> Count 5 of the Indictment charges that:
>
> Beginning in or about November 21, 2008, and continuing until December 18, 2008, in Scott County in the Southern District of Iowa, the defendants Sidney Glennard Hines and David A. Payton did knowingly and intentionally open and maintain a place at 405 West 4th Street, Apartment 21A in Davenport for the purpose of manufacturing and distributing cocaine base, also known as "crack".
>
> You must determine whether the government proved both elements of this crime, which are:
>
> *First*, beginning in or about November 21, 2008 and continuing until December 18, 2008, the defendant knowingly opened and maintained a place at 405 W 4th Street, Apartment 21A in Davenport, Iowa; and
>
> *Second*, the defendant did so for the purpose of manufacturing or distributing crack cocaine.

Payton asserts that the district court erred in declining to give his requested instruction because the record contained no evidence showing that he was anything more than a casual visitor to Parks's apartment. According to Payton, he only stayed at Parks's apartment "a few nights," "off and on," had no key or door code to the apartment, did not help purchase food or pay rent; did not clean or repair the apartment, and only occasionally went to the apartment to "get high." Payton asserts that no evidence demonstrates that he had a specific purpose to use Parks's apartment for drug distribution activities; instead, he argues that the evidence shows that he was merely a "doorman" for Hines and Parks.

We find no error in the district court's instruction, as the instruction accurately stated the elements needed to prove a violation of 21 U.S.C. § 856(a)(1). "The offense of maintaining a drug-involved premises under 21 U.S.C. § 856(a) requires proof that the defendant 'knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, *for the purpose of* manufacturing, distributing, or using any controlled substance . . . .'" *United States v. Russell*, 595 F.3d 633, 642 (6th Cir. 2010) (quoting 21 U.S.C. § 856(a)(1)) (emphasis added in *Russell*). "The meaning of th[e] phrase ['the purpose'] lies within the common understanding of jurors and needs no further elaboration." *United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990).

## E. *Sufficiency of the Evidence*

Payton argues that the government failed to adduce sufficient evidence to support his convictions for conspiracy to manufacture and distribute drugs, opening or maintaining a drug house, and distribution of drugs.

"We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor, and drawing all reasonable inferences in favor of the jury's verdict." *United States v. Kieffer*, 621 F.3d 825, 832 (8th Cir. 2010) (internal quotation and citation omitted).

### 1. *Conspiracy*

According to Payton, insufficient evidence exists to convict him of conspiracy under 21 U.S.C. § 846 because, although the indictment charged him with conspiracy to manufacture, distribute, or possess with intent to distribute 50 grams or more of crack cocaine, the jury only found him responsible for five grams to less than 50 grams. Payton asserts that the jury's finding is important because, in determining drug quantity culpability for the conspiracy, the jury requested of the court "the weight of Drugs found and in evidence by Incident." According to Payton, this showed the jury was examining each "incident" to determine the quantity attributable to him. Payton

-18-

maintains that this fact is important because much of the trial evidence did not include any mention of Payton, as Hines did not meet Payton until late September 2008. According to Payton, only Parks—an individual who lied to the police when arrested and with a significant motivation to minimize his own involvement—claimed that Payton assisted Hines in dealing narcotics.

> "To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007) (quoting *United States v. Espino*, 317 F.3d 788, 792 (8th Cir. 2003)).

*United States v. Hernandez*, 569 F.3d 893, 896 (8th Cir. 2009).

Payton concedes that Parks testified that Payton assisted Hines in dealing narcotics but implies that Parks cannot be believed because of a motivation to minimize his involvement. But "[t]he jury is responsible for assessing the credibility of witnesses and resolving conflicts in testimony, and its conclusions on these issues are virtually unreviewable on appeal." *United States v. Jackson*, 610 F.3d 1038, 1042 (8th Cir 2010) (internal quotations and citations omitted). Furthermore, as the government notes, Parks, Cowan, Castle, and Lueders all testified that Payton distributed crack cocaine, and Parks and Cowan identified Hines as Payton's crack supplier, describing how Payton and Hines sold drugs together. The government produced evidence that Payton gave Hines a cell phone, which Hines used to conduct the drug business. This cell phone was the same one that Hines attempted to flush down the toilet during the police raid. Accordingly, sufficient evidence exists to support the jury's conspiracy verdict.

## 2. *Opening or Maintaining a Drug House*

Payton next argues that a reasonable jury would have concluded that he did not maintain a drug house at Parks's apartment because he did not have a specific purpose, objective, or aim to maintain that apartment for manufacturing, distributing, or using drugs. He asserts that mere presence and mere facilitation of the crime, i.e., opening the door for Morgan, is insufficient to prove that he had a specific purpose. Furthermore, he asserts that he was only a casual visitor who lacked "dominion or control" over the apartment, as he was not on the lease, did not pay rent or buy food, and did not clean or perform repairs on the apartment.

As explained *supra*, "[t]he offense of maintaining a drug-involved premises under 21 U.S.C. § 856(a) requires proof that the defendant 'knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, *for the purpose of* manufacturing, distributing, or using any controlled substance . . . .'" *Russell*, 595 F.3d at 642 (6th Cir. 2010) (quoting 21 U.S.C. § 856(a)(1)) (emphasis added in *Russell*). "The purpose element [of § 856(a)(1)] applies to the person who is charged with maintaining the place for the illegal activity. It is not sufficient that others possess the requisite purpose." *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004) (internal quotation and citation omitted). "'[S]ection 856(a)(1) does not require that drug distribution be the *primary* purpose, but only a significant purpose.'" *Russell*, 595 F.3d at 642 (quoting *United States v. Soto-Silva*, 129 F.3d 340, 346 n.4 (5th Cir. 1997)) (citing *United States v. Church*, 970 F.2d 401, 406 (7th Cir.1992) (rejecting argument that government cannot obtain a conviction under § 856 if drug distribution is "but one of several uses of a residence")).

A defendant's mere presence during a police search of a residence is insufficient to sustain a conviction under § 856(a)(1). *Roberts*, 913 F.2d at 220. "[W]hether a defendant has 'maintained' a place is necessarily a fact-intensive issue that must be resolved on a case-by-case basis." *United States v. Morgan*, 117 F.3d 849, 857 (5th Cir. 1997).

[P]roof of a defendant's "dominion and control" over a place may be *sufficient* to show that he "maintains" that place, *see United States v. Howell*, 31 F.3d 740, 741 (8th Cir. 1994) (per curiam), but . . . proof of "dominion and control" is not *necessary* to establish "maintenance" under section 856(a)(1), *see United States v. Clavis*, 956 F.2d 1079, 1091, *modified on other grounds*, 977 F.2d 538 (11th Cir. 1992), *cert. denied*, __U.S.__, 113 S. Ct. 1619, 123 L. Ed. 2d 178 (1993). In *Clavis*, the Eleventh Circuit stated that "[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity" are relevant to the defendant's "maintenance" of a place. 956 F.2d at 1091.

*United States v. Basinger*, 60 F.3d 1400, 1405 (9th Cir. 1995).

Here, when asked what was occurring at Parks's apartment, Cowan stated, "Drugs were being sold there also by Mr. Hines and David [Payton]." When asked to explain "how that worked," Cowan replied:

Well, one night Mr. Hines was there and people would either call on the phone or come knock at the door. David would answer the door, and he would get the drugs from P [Hines], and he would give—David would give him the money, and then he would give people their drugs, and they left. Sometimes they sat around and smoked, but not very often.

Cowan said that she witnessed this scenario on two occasions.

In addition to Cowan's testimony, Parks testified that in November 2008, he did not "purposefully" make his apartment available to other people for illegal purposes "but that's what was happening." According to Parks, "David Payton" approached him. At first, Payton just "smoked some crack" with Parks in his apartment. Thereafter, Parks testified that "[Hines] came over with [Payton], and they was sitting there watching movies and things like that, and they promised me they wasn't selling no

drugs out of my house." But Parks could "tell what was going on" because "the phone would ring and then [Payton] would go downstairs and come back up." Parks stated that Hines and Payton came to his apartment "two days out of the week" and that "[s]ome days maybe they might go downstairs six times, sometimes maybe just four times, something like that." According to Parks, either Hines's or Payton's phone would ring. When Hines's phone would ring, he would go downstairs, while Parks stayed upstairs. On one or two occasions, Parks saw a couple of bags of crack cocaine exchanged between Hines and "one of his friends." When asked what Payton would do, Parks replied, "He would go out the door, come on back." Payton would "sometimes" "hand [Hines] a few dollars." Parks confirmed that he obtained crack cocaine from Hines "a few times." When asked whether he received payment for letting Hines and Payton deal crack cocaine from his apartment, Parks replied, "No, not as far as no money or—not no money or nothing like that. Maybe a—it wasn't established that [Hines] was selling out of my house, so he would give me a bag sometimes or [Payton] would give it to me." Parks knew that Hines was selling drugs from his apartment because "the phone rings and a person goes downstairs and do this a couple of times, you figure they're selling drugs." On a couple of occasions, "customers started getting in and coming all the way up to [Parks's] apartment." Those "customers" "would meet with Sidney Hines or either David Payton." According to Parks, there would be times when he would be out and, when he got home, Hines and Payton would be there.

Finally, the government produced evidence that on December 18, 2008, Morgan, working under Detective Proehl's direction, arranged to purchase $300 worth of crack cocaine from Hines. Morgan placed recorded calls to Hines, and Hines advised Morgan to meet him at Parks's apartment. Payton met Morgan at the door and followed him up the stairs to Parks's apartment. A short time later, Morgan gave Detective Proehl 20 individually wrapped rocks of crack cocaine.

Based on the testimony of Cowan, Parks, and Detective Proehl, a reasonable jury could find that Payton "knowingly open[ed] . . . or maintain[ed] [Parks's apartment] for the purpose of . . . distributing . . . [a] controlled substance." 21 U.S.C. § 856(a)(1). Both Cowan and Parks testified that Payton was selling drugs out of Parks's apartment, which satisfies the "purpose" element of § 856(a)(1). Parks's testimony establishes, and Detective Proehl's testimony confirms, that Payton "maintained" the site. Parks described how Hines and Payton routinely sold drugs out of Parks's apartment. And, although Payton did not pay rent to or monetarily reward Parks for use of his apartment, Parks testified that either Hines or Payton would give him a bag of crack cocaine in exchange for their use of his apartment.

Accordingly, sufficient evidence exists to support Payton's conviction under § 856(a)(1).

### 3. *Distribution*

Payton also alleges that the evidence is insufficient to support his conviction for distribution or possession with intent to distribute crack cocaine because he was found with no more than a crack pipe on his person, was merely a crack addict, was homeless, and only went to Parks's apartment to "get high" on December 18, 2008. According to Payton, the evidence shows that he was not present in the kitchen when Morgan was purchasing the drugs from Hines.

"In order to convict [Payton] on the distribution count[ ], the government was required to prove beyond a reasonable doubt [Payton] knowingly and intentionally distributed [crack cocaine]." *United States v. Bolden*, 596 F.3d 976, 981 (8th Cir. 2010). For the same reasons as explained *supra* with regard to the § 856 charge, sufficient evidence exists to support the jury's verdict on the distribution charge. Cowan and Parks testified that Payton was selling drugs from Parks's apartment. Parks's testimony also established the routine that Hines and Payton followed in selling the drugs. This "routine" was followed on December 18, 2008, when Morgan

-23-

came to Parks's apartment to purchase crack cocaine. Therefore, sufficient evidence supports Payton's conviction for distribution.

## F. *Drug Quantity*

The presentencing report (PSR) recommended that the district court find Payton responsible for 181.24 grams of crack cocaine. Section 2D1.1(c)(4) of the Guidelines provides that an offense involving possession with intent to distribute at least 150 grams but less than 500 grams of crack cocaine yields a base offense level of 32.

Before the district court, and on appeal, Payton objected to the drug quantity calculations found in several paragraphs of the PSR, contending: (1) he did not participate in the October 19, 2008 transaction and should not be held accountable for 0.3 grams of crack cocaine; (2) no lab report confirmed the drug quantity for the October 19, 2008 transaction; (3) he did not participate in the December 18, 2008 drug transaction and should not be held accountable for the 4.06 grams of crack cocaine sold to Morgan, the 1.71 grams of crack cocaine that Hines flushed down the toilet during the raid, or the 0.17 grams of crack cocaine found on the floor, immediately beneath Parks; (4) he should not be held accountable for 69.75 grams of crack cocaine based on Parks's testimony because Parks is unreliable; (5) he cannot be held responsible for Hines's drug activities that occurred prior to Payton joining the conspiracy and therefore is not responsible for 75 grams of crack cocaine based on Morgan's unsworn statement that he bought 15 to 20 grams of crack cocaine, twice a day, four to five times a week, from Hines; (6) he never paid Parks a rock of crack cocaine to refer customers and accordingly is not responsible for 0.25 grams of crack cocaine based on Parks's unreliable statement; and (7) he was not involved with Hines's distribution activities with Hester and Castle and cannot be held responsible for 30 grams of crack cocaine.

In response, the government argues that the district court did not clearly err in finding Payton responsible for 180 grams of crack cocaine. The government notes that

the critical drug amount for purposes of this appeal is 50 grams of crack cocaine because 21 U.S.C. § 841(b)(1)(A) addresses violations involving 50 grams or more, and the statutory minimum is 20 years.[3]

We review for clear error a district court's drug quantity calculation. *United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006). The government must prove drug quantity by a preponderance of the evidence. *Id.*

"When calculating drug quantity in the context of a narcotics trafficking conspiracy, the sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy. " *Id.* Coconspirators' testimony "may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." *Id.*

---

[3]In a Federal Rule of Appellate Procedure 28(j) letter to the court, Payton asserts that § 841(b)(1)(A) previously required that a defendant be involved with 50 grams of crack cocaine to trigger a mandatory minimum of 10 years and that if the defendant had a prior drug felony conviction, the mandatory minimum became 20 years. He notes that the Federal Sentencing Act of 2010 changed the 50-gram threshold to 280 grams, meaning that the assessment of 181 grams of crack cocaine to him would be insufficient to trigger the 20-year mandatory minimum. As a result, he asks that we vacate his sentence and remand for resentencing in accordance with the new mandatory minimum. But the Act is not subject to retroactive application. *See United States v. Brown*, No. 10-1791, 2010 WL 3958760, at *1 (8th Cir. Oct. 12, 2010) (unpublished per curiam) (stating that "the statutory minimum existing at the time the offense was committed governs") (citing *United States v. Carradine*, 621 F.3d 575, 580 (6th Cir. 2010) (holding that general savings statute, 1 U.S.C. § 109, requires application of penalties in place at time crime was committed unless new enactment expressly provides for its own retroactive application and recognizing that Fair Sentencing Act of 2010 contains no express statement that it is retroactive and that no such express intent can be inferred from its plain language)).

A defendant "may be held responsible" for "'all acts . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Anderson*, 243 F.3d 478, 485 (8th Cir. 2001) (quoting U.S.S.G. § 1B1.3(a)(2)). In applying § 1B1.3(a)(2), the sentencing court "should consider the similarity, regularity, and temporal proximity of the conduct in determining whether it is part of the same course of conduct or common scheme or plan." *Id.* (internal quotations and citations omitted).

When the quantity of drugs that the government seized "does not reflect the scale of the drug trafficking offense," then the sentencing court must "approximate the quantity of the controlled substance for sentencing purposes." *United States v. Sicaros-Quintero*, 557 F.3d 579, 582 (8th Cir. 2009) (internal quotation and citation omitted). "The court may make a specific numeric determination of quantity based on imprecise evidence." *Id.* (internal quotation and citation omitted). The court is permitted to "'consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'" *Id.* (quoting U.S.S.G. § 6A1.3(a)).

Additionally, where a defendant is "charged with conspiracy to distribute [a controlled substance] . . . the amount consumed for personal use should be included in the total." *United States v. Kamerud*, 326 F.3d 1008, 1013 (8th Cir. 2003). By contrast, "[d]rugs acquired for personal use are not relevant conduct when [the] charge is for possession with intent to distribute." *Id.* (citing *United States v. Fraser*, 243 F.3d 473, 475–76 (8th Cir. 2001)).

Here, Payton was not only charged with distribution but also with conspiracy to distribute; therefore, his personal use amounts may be included in the total. *See Kamerud*, 326 F.3d at 1013. As the government points out, Payton testified that he

consumed crack cocaine "all day, everyday" and spent $650 a month on crack cocaine; this testimony alone could support a drug quantity of over 50 grams of crack cocaine.

Furthermore, Payton based many of his objections to the drug quantity calculations in the PSR on witness credibility attacks. For example, Payton asserts that Parks's testimony is unreliable. Parks's testimony, in total, attributed approximately 70 grams of crack cocaine to Payton. The district court could base its drug quantity determination on Parks's testimony, and its assessment of Parks's "credibility is almost never clear error given that court's comparative advantage at evaluating credibility." *Plancarte-Vazquez*, 450 F.3d at 852 (internal quotation and citation omitted).

Finally, the government presented evidence at trial and sentencing of other transactions with drug quantities attributable to Payton. Specifically, the evidence showed that Hines brought Payton to Hester's residence in August 2008, Payton's cell phone called Hines's and Hester's numbers on numerous occasions between July and December 2008, Payton drove Hines to drug transactions on at least seven occasions where five or six $20 bags of crack cocaine were delivered to Morgan, and Payton aided Hines in the distribution of crack cocaine from Parks's residence, including the crack cocaine sold to Morgan on December 18, 2008. Payton's conspiracy conviction makes him responsible for all these transactions, which were reasonably foreseeable and conducted in furtherance of the drug conspiracy. *See Plancarte-Vazquez*, 450 F.3d at 852.

Given the "scale of the drug trafficking offense," the district court's calculation of drug quantity was not clearly erroneous. *See Sicaros-Quintero*, 557 F.3d at 582.

G. *Aggravating Role Enhancement*

The district court applied an aggravating role enhancement under U.S.S.G. § 3B1.1(b). Payton maintains that no evidence exists that he recruited, directed the activities of, or exercised management responsibility over others who ultimately

-27-

worked for Hines. According to Payton, no evidence exists that he had any decisionmaking authority in Hines's business because Payton had no authority to negotiate incoming shipments, set the price for sale to Hines's customers, arrange delivery locations, or make any other judgments for Hines. Payton asserts that the evidence establishes that he was merely a driver or deliverer for Hines and did not profit from these activities.

In response, the government argues that the district court did not clearly err in applying an aggravating role enhancement because Payton recruited Parks to bring him crack customers, paid Parks with cigarettes, liquor, or small amounts of crack cocaine, brought Hines to Parks's apartment to set up the drug operation, and brought Bowes into the conspiracy, as evidenced by Lueders's testimony.

A district court may increase a defendant's offense level by three levels "if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." *United States v. Bolden*, 622 F.3d 988, 990 (8th Cir. 2010) (internal quotations, alteration, and citations omitted). "We construe the terms 'manager' or 'supervisor' broadly under U.S.S.G. § 3B1.1, and the simple fact that a defendant recruits new members into a conspiracy supports a finding of the defendant being a manager or supervisor." *Id.* (internal quotations and citations omitted). Application Note 4 to U.S.S.G. § 3B1.1 sets forth factors that the sentencing court should consider, which are:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This

-28-

adjustment does not apply to a defendant who merely suggests committing the offense.

Under § 3B1.1, a "participant" is one "who is criminally responsible for the commission of the offense, but need not have been convicted." *United States v. Garcia-Hernandez*, 530 F.3d 657, 664 (8th Cir. 2008) (internal quotation and citation omitted). "Participants include intermediaries who sell drugs on behalf of the defendant." *Id.* (internal quotation, alteration, and citation omitted). "For a sentencing court to impose a managerial or supervisory role enhancement there must be sufficient evidence from which to find that the defendant controlled at least one other participant in the drug trafficking offense." *Plancarte-Vazquez*, 450 F.3d at 853 (internal quotation and citation omitted).

We review for clear error "[t]he district court's factual findings, including its determination of a defendant's role in the offense," and we review de novo its "application of the guidelines to the facts." *Bolden*, 622 F.3d at 990 (internal quotation and citation omitted). The government must prove the applicability of the sentencing enhancement by a preponderance of the evidence. *Id.*

Here, Payton virtually concedes that the conspiracy involved five or more participants: Hines, Payton, Parks, Parkerson, and Morgan.[4] Furthermore, sufficient evidence exists in the record that Payton controlled *at least* one participant—Parks. Payton recruited Parks to bring him customers, paying him in cigarettes, liquor, or small amounts of crack cocaine. Furthermore, the evidence established that Payton brought Hines to Payton's apartment to set up their drug operation. *See supra* Part E.2.

---

[4]In his brief, Payton asserts that "[a]t most, the government may be able to prove that Hines was the leader, and during the time Payton was involved, Hines directed the activities of: Payton, Parks, Parkerson, and Morgan."

Therefore, we hold that the district court did not err in applying the aggravating role enhancement.

### H. *Disparity Between Powder Cocaine and Crack Cocaine*

Payton's final challenge is to the reasonableness of his sentence, arguing that the district court erred in refusing to vary downward from the Guidelines to ameliorate the unfairness of the crack-to-powder cocaine ratio in U.S.S.G. 2D1.1. Payton notes that the Fair Sentencing Act of 2010, signed into law on August 3, 2010, adjusts the quantity of crack cocaine necessary to trigger the mandatory minimum sentence and directs the Sentencing Commission to revise the Guidelines for crack cocaine.

"We review the reasonableness of a defendant's sentence under a deferential abuse-of-discretion standard, ensuring that the district court committed no significant procedural error and that the sentence is substantively reasonable." *United States v. Brewer*, 624 F.3d 900, 908–09 (8th Cir. Oct. 21, 2010) (internal quotations and citations omitted).

"Here, the district court considered and rejected [Payton's] request for a variance based on the crack/powder disparity. Thus, the district court was well within its discretion not to vary downward." *Id.* at 909 (internal quotation, alteration, and citation omitted). Furthermore, "the Fair Sentencing Act contains no express statement that it is retroactive, and thus the general savings statute, 1 U.S.C. § 109, requires us to apply the penalties in place at the time the crime was committed." *Id.* at 909 n.7 (internal quotation and citations omitted). Finally, Payton's prior felony drug conviction compels a mandatory minimum sentence of 240 months' imprisonment. "District courts lack the authority to reduce sentences below congressionally-mandated statutory minimums." *United States v. Watts*, 553 F.3d 603, 604 (8th Cir. 2009).

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____